UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARGUERITA SANICHARA,

       Plaintiff,

v.                        Case No. 8:24-cv-2635-VMC-AAS

GEICO GENERAL INSURANCE CO.,

       Defendant.

_____/

**ORDER**

This matter comes before the Court pursuant to Defendant GEICO General Insurance Co.'s Motion for Summary Judgment (Doc. # 43), filed on October 20, 2025, seeking summary judgment on all claims in this Americans with Disabilities Act (ADA) and Family and Medical Leave Act (FMLA) case. Plaintiff Marguerita Sanichara responded on November 24, 2025. (Doc. # 46). GEICO replied on December 12, 2025. (Doc. # 47). For the reasons that follow, the Motion is granted.

I.   **Background**

A. **Parties and GEICO Policies**

Ms. Sanichara was hired by GEICO on May 2, 2005. (Pl. Depo. at 14:14-19). At all relevant times, Ms. Sanichara's job was Supervisor, Claims Specialist II, in GEICO's Lakeland, Florida call center. (Id. at 15:13-25; Holmer Depo.

1

at 7:15-20). In total, Ms. Sanichara worked for GEICO for almost 19 years and had no prior discipline before her termination in February 2024. In 2023, she received a positive performance appraisal as "above expectations" and was described as "one of the strongest leaders in the department and country." (Pl. Decl. ¶¶ 2, 4-5, 43-44; Pl. Performance Eval.). Ms. Sanichara's direct manager was Claims Manager Kristin Holmer, who in turn reported to Claims Director Janine McMillan. (Pl. Depo. at 28:16-23; Holmer Depo. at 8:19-22).

Ms. Sanichara was familiar with and understood GEICO's workplace conduct policies, including GEICO's Employee Handbook and Conduct Standards. (Pl. Depo. at 97:6-98:11 & Ex. 7). GEICO's Conduct Standards require associates to treat each other with "dignity and respect" and prohibit conduct such as belittling and screaming at others, or harassing, abusive, or offensive behavior and require violations to be reported. (Id.).

Ms. Sanichara was also familiar with and received training regarding GEICO's FMLA policy, which outlined the procedures for GEICO employees to submit leave requests. (Pl. Depo. at 73:12-24, Ex. 5). GEICO provides FMLA leave to its employees to care for a spouse, child, or parent with a serious health condition. (Id. at Ex. 5).

Ms. Sanichara was familiar with GEICO's process and procedures for requesting FMLA leave. She was trained on FMLA leave as a supervisor, and she had previously taken FMLA leave at GEICO. (Id. at Ex. 6; Holmer Depo. at 21:16-20). However, Ms. Sanichara disputes that the process outlined in the Handbook is the only permissible way to request FMLA leave. She testified that in the Lakeland office "everything needs to go through management," with an employee making an FMLA request to their supervisor who then escalates the request to the Director and Human Resources ("HR"). (Pl. Depo. at 86:25-88:24; Pl. Decl. at ¶¶ 15-16). Following this procedure, Ms. Sanichara requested leave from Ms. Holmer, her direct supervisor, who she believed would then discuss the request with Ms. McMillan. (Pl. Decl. at ¶ 17).

Other GEICO employees, including Ms. Holmer and Ms. McMillan, disagree with Ms. Sanichara's understanding of FMLA requests, testifying that leave requests must be submitted to the leave team with HR and HR would make the leave decision. (Holmer Depo. at 15:19-16:20; Malone Depo. at 16:2-17:1; McMillan Depo. at 29:4-13).

**B. Need for FMLA Leave**

In early-mid January 2024, Ms. Sanichara told Ms. Holmer she needed a few weeks up to two months of leave to care for

3

her parents, who had diabetes and kidney and heart conditions. Ms. Holmer told her "we will do it." (Pl. Depo. at 90:24-91:4, 134:13-15, 138:3-7, 142:12-143:3; Holmer Depo. at 20:2-15; Pl. Decl. at ¶¶ 10-14, 16-17). She admits that the only GEICO manager she spoke to about her parents' medical condition and need for FMLA leave was Ms. Holmer. (Pl. Depo. at 90:24-91:4, 134:13-15, 142:12-143:3; Holmer Depo. at 20:2-15).

Ms. Sanichara believed that her request to Ms. Holmer was sufficient and would be relayed to higher management and eventually HR. (Pl. Decl. at ¶¶ 14-17). For that reason, Ms. Sanichara did not directly submit a request for leave related to her parents' medical conditions to GEICO's leave team or HR. (Pl. Depo. at 143:15-144:7).

Ms. Sanichara did not talk to Claims Manager Justin Perkins, Lead Investigator Lisa Malone, Ms. McMillan, Claims Manager Anthony Interdonato, or any other GEICO manager or HR employee about her need to take FMLA leave or her parents' health conditions. (Pl. Depo. at 143:15-144:7; 150:1-10). Nevertheless, Ms. Sanichara avers that "GEICO management had actual notice of [her] FMLA request" because of her request to Ms. Holmer. (Pl. Decl. at ¶¶ 53, 56). She avers that GEICO's decisionmakers for her termination "are imputed with

4

the company's knowledge of [her] protected status." (Id. at ¶ 53).

### C. **Complaints and Investigation**

In January 2024, another supervisor at GEICO's Lakeland call center reported to Mr. Perkins that she heard an adjuster from Ms. Sanichara's team, E.B., stating that they were working claims when they were assigned out of the phone queue, which would manipulate the productivity statistics to appear more productive. (Perkins Depo. at 25:5-25). Ms. Sanichara denies that she directed her team to manipulate productivity or misuse the queue. (Pl. Decl. at ¶¶ 25, 40-41). Ms. Holmer was out on leave at the time the report was made to Mr. Perkins. (Holmer Depo. at 13:11-18).

Following the report, Mr. Perkins interviewed E.B. and escalated the matter to GEICO's investigation team. Mr. Perkins also spoke to A.S., another subordinate (or "team member") of Ms. Sanichara's, during the investigation. (Perkins Depo. at 12:8-10, 17:4-7, 18:17-18). Mr. Perkins did not discuss the matter with Ms. Sanichara. (Pl. Depo. at 156:10-13). Ms. McMillan spoke to Ms. Sanichara about the issue on January 24, 2024, and told her that "an initial look" at Ms. Sanichara's team's productivity numbers did not

reflect that productivity manipulation had occurred. (McMillan Depo. at Ex. 1 at GEICO00204).

Nevertheless, Ms. Malone conducted an independent investigation relating to Ms. Sanichara's alleged workplace misconduct. Ms. Malone was a lead investigator with GEICO from 2020 through 2025. (Malone Depo. at 7:7-10). She was responsible for handling cases involving egregious misconduct. (Id. at 7:11-16). Her role was to be impartial and investigate cases based on facts and substantiation of witnesses. (Id. at 8:3-6). In an investigation involving Code of Conduct violations, Ms. Malone and others testified that an employee's length of employment and job performance are not relevant considerations. (Id. at 17:19-24; Perkins Depo. at 20:18-21:4; McMillan Depo. at 26:10-22).

Ms. Malone documented her investigation in GEICO's i-Sight platform. (Malone Depo. at 8:7-9:1). Ms. Malone reviewed audit data, interviewed witnesses, and obtained reports from managers Ms. Holmer and Ms. McMillan, who spoke to Ms. Sanichara. (Id. at Ex. 6 at GEICO00207; Smalls Decl. at Ex. 1 at GEICO00288).

While investigating the productivity manipulation allegation, Ms. Malone received an additional complaint from an Information Technology associate that Ms. Sanichara did

not allow one of her team members to complete her appointment to have her hearing aid software installed as an accommodation. (Malone Depo. at 12:21-25; McMillan Depo. at 39:3-20 & Ex. 2). Ms. Sanichara swears she "never prevented any associate from completing an appointment related to hearing aid software installation" and she "consistently supported reasonable accommodations in accordance with company policy and federal law." (Pl. Decl. at ¶ 30).

Ms. Malone interviewed the team member who was receiving the accommodation, and she reported additional alleged misconduct by Ms. Sanichara in managing her team. Some of Ms. Sanichara's team members claimed that she talked down to and demeaned them, as well as threatened to terminate their employment with GEICO. (Malone Depo. at GEICO00212-00213). During the investigation, Ms. Sanichara's team members reported alleged unprofessional behavior and lack of support. (Smalls Decl. at Ex. 2 at GEICO00293-94).

Some statements by Ms. Sanichara's team members included:

• "She is very aggressive. She yells at us like, literally voice raised yelling at us all the time."

• "I have heard her call people stupid many times before."

- "We are not allowed to speak to other supervisors or each other. We are only allowed to reach out to her specifically."

- "Marguerita responded Oh my God, ya'll[,] guess what, [A.S.] can hear, she no longer has a hearing problem. No one else knew that, I was so embarrassed and humiliated, I went home crying."

- "She won't let me put in my overtime."

- "She calls everyone stupid; nothing is private."

- "If you are having computer problems, she screams at you and tells you that you are wasting her time and the company time and we should get here earlier to turn our computers on."

(Id.).

Additionally, although management had warned Ms. Sanichara not to speak to her team members about the investigation, some team members claimed that Ms. Sanichara approached them to try to obtain information relating to the investigation. (Id. at GEICO00293). Team members reported that Ms. Sanichara discussed the investigation with them and instructed them to send her an email stating that they do not use queue to work while signed out, which was the form of productivity manipulation alleged. (Id.). E.B. emailed Mr. Perkins on January 25, 2024, informing him that Ms. Sanichara had told her team that she knew one of them had spoken about the alleged manipulation of productivity numbers. (Malone Depo. at GEICO00252). According to E.B., Ms. Sanichara "asked the team to send her an email so she could send to her manager

8

that we do not [manipulate the productivity numbers]." (Id.).
Ms. Sanichara said her team members "had the option not to
send the email if it made [them] uncomfortable but [E.B.]
sent the email so [E.B.] would not be suspicious." (Id.).
E.B. sent the email requested by Ms. Sanichara denying
manipulation of productivity numbers even though he had
earlier informed Mr. Perkins that Ms. Sanichara would
"instruct" her team members to manipulate the productivity
numbers using the queue. (Id. at GEICO00253).

Ms. Sanichara denies that she mistreated or talked down
to her team members or threatened to fire them. (Pl. Decl. at
¶¶ 34-38). She also denies telling any team member "that they
would be fired or punished for reporting concerns to HR,
Associate Relations, or management," and avers that she "did
not discourage anyone from participating honestly in any
investigation." (Id. at ¶¶ 35, 37). Ms. Sanichara swears that
she "did not ask any associate to send an email denying misuse
of the queue or to write something that was not true" and she
did not discuss the investigation with her team members. (Id.
at ¶¶ 24, 39).

Ms. Malone did not interview Ms. Sanichara during the
investigation. (Malone Depo. at 24:6-21, 45:2-24). GEICO's
policy on investigations provides that an investigator should

interview an "alleged wrongdoer (if necessary)" and should "[d]etermine whether the interview [of an alleged wrongdoer] is needed and if [it] would do more harm than good." (Doc. # 53). Ms. Malone could not recall whether she made a "more harm than good" determination in deciding not to interview Ms. Sanichara. (Malone Depo. at 45:2-46:13).

After completing the investigation, Ms. Malone concluded that the allegations of Ms. Sanichara's violation of GEICO's policies were substantiated, submitted her findings to the HR termination team for review for termination, and shared her findings with Mr. Perkins and Ms. McMillan. (Malone Depo. at 29:11-15 & Ex. 6 at GEICO00210; Perkins Depo. at 19:3-8; McMillan Depo. at 30:11-31:18).

Ms. Malone had no knowledge of Plaintiffs' parents' medical conditions or her need to take FMLA leave. (Malone Depo. at 48:3-14). Ms. Malone did not participate in the decision to terminate Plaintiff's employment. Management made that determination. (Id. at 13:7-18).

### D. **Termination**

For his part, Mr. Perkins was concerned about the behaviors reported by Ms. Sanichara's team members. (Perkins Depo. at 14:1-16, 18:4-11). Around February 2, 2024, Mr. Perkins prepared a Separation Memo recommending GEICO

terminate Ms. Sanichara's employment due to her supposed violation of GEICO's Code of Conduct. (Perkins Decl. at Ex. A at GEICO00311). Mr. Perkins decided to terminate Ms. Sanichara's employment based on the complaints of egregious workplace misconduct, including that Ms. Sanichara allegedly retaliated against members of her team for coming forward regarding the productivity manipulation, threatened and mistreated the adjusters, and interfered with the investigation. (Id.; Perkins Depo. at 14:1-16, 17:25-19:8). Again, Ms. Sanichara denies that she violated the Code of Conduct. (Pl. Decl. at ¶¶ 24-25, 34-41).

Following GEICO's procedure, Mr. Perkins sent Ms. McMillan the Separation Memo with his termination recommendation, and she agreed with it. (Perkins Depo. at 10:21-25, 23:10-13; Perkins Decl. at Ex. A at GEICO00311; McMillan Depo. at 29:25-30:4). But, during her deposition, Ms. McMillan could not recall reviewing any documents before agreeing with termination, and Mr. Perkins did not have access to Ms. Sanichara's personnel file before recommending termination. (McMillan Depo. 30:5-8; Perkins Depo. 20:14-17).

Mr. Perkins then sent the Separation Memo to HR. The termination review from HR states that the "[i]nvestigation conducted substantiated inappropriate behavior by the

associate towards direct reporting associates." (Smalls Decl. at Ex. 2 at GEICO00288-290). HR did not disagree with Mr. Perkins' recommendation. (Id. at Ex. 3 at GEICO00309). Mr. Perkins called Ms. Sanichara to let her know GEICO was terminating her employment, with Mr. Interdonato participating as a witness. (Perkins Depo. at 11:8-12). Ms. Sanichara's termination was effective February 5, 2024. (Pl. Depo. at 123:24-124:7).

Mr. Perkins had no knowledge about Ms. Sanichara's need or request for FMLA leave or her parents' medical conditions when he made the decision to terminate Ms. Sanichara's employment. (Perkins Decl. at ¶ 9; Perkins Depo. at 21:13-16). Ms. McMillan, similarly, had no knowledge that Ms. Sanichara asked for leave related to her parents' health conditions. (McMillan Depo. at 28:1-5). Ms. Holmer was not consulted on the decision to terminate Ms. Sanichara's employment and was not the decisionmaker. (Holmer Depo. at 22:7-24).

Ms. Sanichara believes that she was fired because of her FMLA request due to the timing of her termination. She testified, "I think based on my FMLA request I got fired, because everything relates to that. What else could it be? There is nothing else." (Pl. Depo. at 153:3-10).

12

### E. Procedural History

Ms. Sanichara initiated this action against GEICO in November 2024. (Doc. # 1). In her amended complaint, Ms. Sanichara asserts the following claims: (1) ADA associational discrimination (Count I); (2) FMLA Interference (Count II); and (3) FMLA retaliation (Count III). (Doc. # 21). GEICO answered the amended complaint (Doc. # 22), and the case proceeded through discovery.

GEICO now seeks summary judgment on all claims. (Doc. # 43). Ms. Sanichara has responded (Doc. # 46), and GEICO has replied. (Doc. # 47). The Motion is ripe for review.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742

(11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference

14

from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

### A.   **ADA Associational Discrimination**

The ADA provides protection against discrimination by prohibiting an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). This type of unlawful discrimination under the ADA is typically referred to as "association discrimination." <u>See</u>, <u>e.g.</u>, <u>Wascura v. City of S. Miami</u>, 257 F.3d 1238, 1242 (11th Cir. 2001); <u>Hilburn v. Murata Elecs. N. Am., Inc.</u>, 181 F.3d 1220, 1230 (11th Cir. 1999).

"[A] plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII

employment discrimination cases."[1] <u>Wascura</u>, 257 F.3d at 1242; <u>see also McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> procedural framework, "[a] plaintiff attempting to establish a prima facie case of 'association discrimination' under the ADA must establish: (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative with a disability; and (4) that 'the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a

---

[1] "[E]stablishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011). Because the parties have framed their analysis through the <u>McDonnell Douglas</u> framework rather than the convincing mosaic approach (Doc. # 43 at 3, 21-24; Doc. # 46 at 16-19), the Court applies the "ordinary summary judgment standard" in terms of the <u>McDonnell Douglas</u> framework, recognizing "the <u>McDonnell Douglas</u> framework and the convincing mosaic approach are two paths to the same destination." <u>McCreight v. AuburnBank</u>, 117 F.4th 1322, 1335 (11th Cir. 2024). That is, the Court first analyzes whether Ms. Sanichara has presented sufficient evidence to make out a prima facie case of associational disability discrimination before addressing more broadly the "ultimate question . . . whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." <u>Tynes v. Fla. Dep't of Juv. Just.</u>, 88 F.4th 939, 941 (11th Cir. 2023).

determining factor in [the employer's] decision.'" <u>Wascura</u>, 257 F.3d at 1242 (citation omitted).

"Once a plaintiff establishes a prima facie case of discrimination, the defendant-employer must articulate a legitimate, non-discriminatory reason for the challenged action." <u>Id.</u> "However, the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" <u>Id.</u>

"If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" <u>Id.</u> (citation omitted). "Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of

credence.'" <u>Gogel v. Kia Motors Mfg. of Ga., Inc.</u>, 967 F.3d 1121, 1136 (11th Cir. 2020)(citation omitted). "[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted). The pretext inquiry "merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." <u>Tynes v. Fla. Dep't of Juv. Just.</u>, 88 F.4th 939, 944 (11th Cir. 2023) (citation omitted).

Here, Ms. Sanichara has failed to establish a prima facie case of associational discrimination. No one involved in the investigation or in deciding to terminate Ms. Sanichara knew about Ms. Sanichara's parents' medical conditions. <u>See Akridge v. Alfa Ins. Companies</u>, 93 F.4th 1181, 1196 (11th Cir. 2024) ("[W]hile the decisionmakers and Forrest knew of Akridge's disabilities, her evidence does not show that anyone, and certainly not the decisionmakers or Forrest, knew her specific individual healthcare costs — the basis she provides for Alfa's alleged discrimination." (citations omitted)). This includes Ms. Malone, Mr. Perkins, and Ms. McMillan. (Malone Depo. at 48:3-14; Perkins Decl. at ¶ 9; McMillan Depo. at 28:1-5). Indeed, Ms. Sanichara testified

that she did not tell any of these individuals about her need for FMLA leave or her parents' health. (Pl. Depo. at 143:15-144:7; 150:1-10).

True, Ms. Sanichara told her direct supervisor Ms. Holmer about her parents' medical conditions, which the Court credits as a legitimate leave request. (Pl. Decl. at ¶¶ 11-14, 56). But Ms. Holmer was not involved in the decision to terminate Ms. Sanichara. (Holmer Depo. at 18:22-24, 22:7-24). Likewise, there is no evidence that Ms. Holmer informed the decisionmakers about Ms. Sanichara's parents and her need for leave. (Id. at 18:22-24, 22:7-24, 32:6-13). Thus, Ms. Holmer's knowledge does not create a genuine dispute as to the knowledge of the decisionmakers.

"[I]t is evident that an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1185 (11th Cir. 2005). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001). Without knowledge of the disabilities of Ms. Sanichara's parents, the decisionmakers for her termination could not have terminated her "because of" her association with her parents. Ms. Sanichara's

19

assertion that her informing Ms. Holmer of her parents' disabilities gave GEICO management "actual notice" of the issue is unavailing and based on speculation. (Pl. Decl. at ¶¶ 53, 56). What is required is actual knowledge. Cordoba, 419 F.3d at 1185. The Court will not impute Ms. Holmer's knowledge to those decisionmakers. See Howard v. Steris Corp., 550 F. App'x 748, 751 (11th Cir. 2013)("Howard argues that the decision makers had *constructive* notice of his sleep disorder. This argument fails."); Pecora v. ADP, LLC, 232 F. Supp. 3d 1213, 1219 (M.D. Fla. 2017) ("Even when the employee's direct supervisor has knowledge of information indicating that an employee suffers from a disability, that information will not be imputed to the employer when the supervisor is not the one making the termination decision."); Ward v. City of Gadsden, No. 4:15-cv-0865-VEH, 2017 WL 568556, at *8 (N.D. Ala. Feb. 13, 2017) (granting summary judgment on ADA claim because of the decision maker's "lack of actual awareness" of plaintiff's disability).

Because Ms. Sanichara has failed to establish a prima facie case of discrimination, she is not entitled to the presumption of discrimination under McDonnell Douglas. Nevertheless, this does not end the analysis. The Court still addresses whether there is sufficient evidence for a

reasonable jury to find in Ms. Sanichara's favor. See Ismael v. Roundtree, 161 F.4th 752, 761 (11th Cir. 2025) ("[A] plaintiff who cannot establish the McDonnell Douglas prima facie case is entitled to a full review under the convincing mosaic standard."). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019). The convincing mosaic approach "is not more forgiving than the [McDonnell Douglas framework] on the final question, which is whether a reasonable jury could infer illegal discrimination." McCreight, 117 F.4th at 1335.

Here, Ms. Sanichara relies on the temporal proximity between her informing Ms. Holmer about her parents' illnesses and her need for leave and her termination. (Doc. # 46 at 16). She also denies that she committed the misconduct her team members accused her of during the investigation. (Id. at 4-7, 18). Furthermore, she criticizes the results,

thoroughness, and fairness of Ms. Malone's investigation. (Id. at 17-18).

Despite her arguments to the contrary, Ms. Sanichara has failed to raise a genuine dispute about whether the reason for her termination was discrimination. Again, there is no evidence that the decisionmakers for her termination had any knowledge of Ms. Sanichara's parent's illnesses, which dooms Ms. Sanichara's case. Next, the temporal proximity between Ms. Sanichara's informing Ms. Holmer about her parents' medical conditions and Ms. Sanichara's termination does not create a genuine dispute as to discrimination under the circumstances of this case. "[T]emporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1219 (11th Cir. 2021); Wascura, 257 F.3d at 1247 (holding that where ample legitimate reasons supported a termination decision, temporal proximity of three and a half months, standing alone, was insufficient to meet the plaintiff's burden of showing that the employer's articulated reasons for termination were pretextual). While Ms. Sanichara was terminated a few weeks after requesting leave from Ms. Holmer, this closeness in time is insufficient by itself to suggest that the real reason for her termination was

discrimination given the decisionmakers' lack of knowledge. See Rudy v. Walter Coke, Inc., 613 F. App'x 828, 830 (11th Cir. 2015) (stating in the context of an FMLA retaliation claim that "[t]emporal proximity alone does not establish a causal connection when there is unrebutted evidence that the decisionmaker was not aware of the protected activity").

Next, Ms. Sanichara's denials of misconduct do not create a genuine dispute as to whether GEICO's reason for her termination was discrimination. The Court accepts as true that all the accusations made against Ms. Sanichara by her team members were false, as Ms. Sanichara swears. (Pl. Decl. at ¶¶ 24-25, 30-32, 35-41). Nevertheless, the fact that she is innocent of misconduct does not by itself create a genuine dispute as to whether her termination was pretextual. See Lewis, 934 F.3d at 1185 (noting that whether "the employer's justification [for the adverse employment action] is pretextual" is a factor to be considered for the "convincing mosaic" analysis).

"[A]n employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a discriminatory reason." Akridge, 93 F.4th at 1195 (citation omitted) (emphasis added). "The relevant inquiry is []

whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee." Gogel, 967 F.3d at 1148. "[T]he pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." Akridge, 93 F.4th at 1196 (citation omitted); see also E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions — that is, to accept one as true and to reject one as fictitious — at least, as long as the choice is an honest choice.").

After receiving one complaint about Ms. Sanichara allegedly directing her team members to manipulate their productivity numbers, GEICO performed an investigation into Ms. Sanichara. That investigation revealed additional complaints by Ms. Sanichara's team members about Ms. Sanichara's treatment of them, including screaming, belittling, preventing one employee from completing an appointment to have hearing aid software installed on her

computer, and discussing the investigation with her team members despite directions not to. Only after interviewing multiple individuals about Ms. Sanichara's conduct and crediting them as truthful did GEICO terminate Ms. Sanichara.

Ms. Sanichara does not dispute those employees made the noted complaints about her. Nor does she allege that the complaining employees were asked by GEICO management or decisionmakers to lie about Ms. Sanichara to justify her termination. Thus, it is undisputed that numerous employees told the investigator that Ms. Sanichara engaged in misconduct. The results of the investigation gave GEICO a good faith basis to believe (albeit erroneously, taking Ms. Sanichara's view) that Ms. Sanichara was guilty of various misconduct. Even if the complaint about productivity manipulation was not credible given the "initial review" of queue activity did not reveal manipulation (Doc. # 46 at 16-17), there were numerous complaints about conduct besides productivity manipulation.

Ms. Malone's failure to interview Ms. Sanichara during the investigation likewise does not create a genuine dispute as to discrimination. (Pl. Decl. at ¶¶ 26-29). True, "[p]roof that an employer failed to follow its established policies in reaching an employment decision may be evidence of pretext."

Harley v. The Health Ctr. of Coconut Creek, Inc., 487 F. Supp. 2d 1344, 1354 (S.D. Fla. 2006). Here, however, GEICO did not as a matter of policy require an alleged wrongdoer be interviewed during an investigation. See (Doc. # 53) (directing the interviewer to "[d]etermine whether the interview [of an alleged wrongdoer] is needed and if [it] would do more harm than good"). Although Ms. Malone could not remember making a "more harm than good" determination to decide not to interview Ms. Sanichara (Malone Depo. at 45:2-46:13), this lack of recollection does not establish that GEICO's policy was not followed during the investigation. While it may have been better for Ms. Malone to get Ms. Sanichara's side of the story, Ms. Malone had already been told by multiple employees during the investigation that Ms. Sanichara behaved poorly. Nor does Ms. Sanichara's complaint that the investigator and decisionmakers failed to review certain documents like her personnel file support that her termination was discriminatory.

Likewise, Ms. Sanichara's reliance on E.B.'s statement in an email to Mr. Perkins that he sent another email at Ms. Sanichara's request denying productivity manipulation is unavailing. According to Ms. Sanichara, E.B.'s statement "indicat[es] that at least one denial during the

26

investigation was influenced by fear rather than by [Ms. Sanichara's] request" such that some witness statements "were not neutral or reliable accounts." (Doc. # 46 at 12, 28). This does not help Ms. Sanichara's argument. Even reading the email in the light most favorable to Ms. Sanichara, E.B.'s email to Mr. Perkins reported that Ms. Sanichara discussed the investigation with her team members and interfered with the investigation by asking her team members to deny any productivity manipulation in an email to her. (Malone Depo. at GEICO00252). Even though E.B. had earlier told Mr. Perkins that Ms. Sanichara had her team members engage in productivity manipulation, E.B. told Mr. Perkins that he sent Ms. Sanichara the email she supposedly requested denying productivity manipulation to avoid *Ms. Sanichara's* suspicion. (Id. at GEICO00252-GEICO00253). E.B.'s email suggests that some of Ms. Sanichara's team members were supposedly afraid of retaliation *by Ms. Sanichara*. Assuming E.B. was not telling the truth (given Ms. Sanichara's denial), E.B.'s email to Mr. Perkins nevertheless supports that GEICO had a good faith belief that Ms. Sanichara was engaging in misconduct.

Given that multiple employees informed GEICO that Ms. Sanichara had engaged in various forms of misconduct, no reasonable jury could conclude that GEICO's determination

that Ms. Sanichara had engaged in misconduct worthy of termination was a pretext for discrimination (or retaliation).

Under the convincing mosaic approach, no reasonable jury could find that the reason for Ms. Sanichara's termination was associational disability discrimination. As mentioned before, the investigator who determined Ms. Sanichara engaged in misconduct worthy of termination had no knowledge of Ms. Sanichara's parents' illnesses. Likewise, no decisionmaker for her termination was aware of her parents' health issues. And there were ample accusations of misconduct against Ms. Sanichara made around the same time Ms. Sanichara mentioned her parents' illnesses to Ms. Holmer. Ms. Holmer was sympathetic and supportive of Ms. Sanichara's desire to take time off to care for her parents. No evidence has been submitted suggesting that GEICO harbored hostility toward employees who were disabled or associated with disabled individuals. Ms. Sanichara has not identified any comparators who were treated better than her. She has not identified any GEICO employee who an investigator found committed similarly severe misconduct but was not terminated.

Thus, the Motion is granted as to the ADA claim.

**B.** **FMLA Retaliation**

Next, Ms. Sanichara's FMLA retaliation claim fails. "FMLA retaliation is distinct from FMLA interference in that to succeed on a FMLA retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1282 (M.D. Ala. 2014) (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)). "A retaliation claim, therefore, is different from an interference claim because an employee must show intent to retaliate." Id.

The McDonnell Douglas burden-shifting framework may apply to FMLA retaliation claims but is not the only method to survive summary judgment. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). "A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." Krutzig, 602 F.3d at 1234. "The causal connection element is satisfied if a plaintiff shows that the

protected activity and adverse action were 'not wholly unrelated.'" Id. (citation omitted).

"Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." Id. at 1234-35. "Temporal proximity alone, however, is not sufficient to establish a causal connection when there is unrebutted evidence that the decision maker was not aware of the protected activity." Id. at 1235. "Furthermore, knowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim." Id.

Here, Ms. Sanichara cannot establish a prima facie case of FMLA retaliation or a convincing mosaic of circumstantial evidence of FMLA retaliation. Again, there is undisputed evidence that the investigator and decisionmakers for her termination did not know about her need or request for FMLA leave. (Malone Depo. at 48:3-14; Perkins Decl. at ¶ 9; McMillan Depo. at 28:1-5; Smalls Decl. at ¶ 8). Indeed, in her declaration, Ms. Sanichara acknowledges that she only told her direct supervisor, Ms. Holmer, about her need for FMLA leave, though she asserts this gave "GEICO management []

actual notice of [her] FMLA request." (Pl. Decl. at ¶¶ 53, 56). However, the knowledge of Ms. Sanichara's need for FMLA leave by her direct supervisor, Ms. Holmer, cannot be imputed to the decisionmakers for the termination. <u>Krutzig</u>, 602 F.3d at 1235.

The relevant GEICO employees, including Ms. Malone and Mr. Perkins, investigated a complaint against Ms. Sanichara without any awareness of Ms. Sanichara's request for FMLA leave. <u>See</u> <u>Rudy</u>, 613 F. App'x at 830 ("Temporal proximity alone does not establish a causal connection when there is unrebutted evidence that the decisionmaker was not aware of the protected activity."). During that investigation, multiple team members who reported to Ms. Sanichara complained about her. While the Court accepts that these team members were not truthful about how Ms. Sanichara behaved toward them, there is no dispute that these team members made the complaints recorded by Ms. Malone and Mr. Perkins. Although she did not interview Ms. Sanichara, Ms. Malone believed the team members' complaints and considered those complaints to be substantiated misconduct by Ms. Sanichara. From there, GEICO decisionmakers decided that termination was the proper discipline for the misconduct.

Additionally, there is no evidence that GEICO retaliated against any other employees for requesting FMLA leave or that anyone at GEICO made negative comments about employees' use of FMLA leave. In fact, Ms. Sanichara had taken FMLA leave in the past. (Pl. Decl. at ¶ 8). Given the lack of evidence of retaliatory animus toward FMLA users, the lack of knowledge by decisionmakers, and the existence of unrelated complaints against Ms. Sanichara made around the same time Ms. Sanichara requested FMLA leave from Ms. Holmer, the temporal proximity of her request to her termination a few weeks later is insufficient to allow a reasonable jury to conclude that retaliation occurred.

In short, Ms. Sanichara has not shown a genuine dispute of material fact as to whether GEICO retaliated against her for requesting FMLA leave.

### C. **FMLA Interference**

Finally, the FMLA interference claim also fails. "To establish an FMLA interference claim an employee must demonstrate by a preponderance of the evidence that he was denied a benefit to which he was entitled." Bradley, 54 F. Supp. 3d at 1277 (citing Pereda v. Brookdale Senior Living Communities, 666 F.3d 1269, 1274 (11th Cir. 2012)). "Benefits under the FMLA include both taking leave and being reinstated

following a leave period, subject to certain conditions." Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017). "[T]he right to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." Krutzig, 602 F.3d at 1236.

Here, there is no genuine dispute of material fact over whether GEICO would have terminated Ms. Sanichara regardless of her FMLA request. The people who investigated Ms. Sanichara for misconduct and decided to terminate her did not know about Ms. Sanichara's need or request for FMLA leave. This includes Ms. Malone, Mr. Perkins, and Ms. McMillan. (Malone Depo. at 48:3-14; Perkins Decl. at ¶ 9; McMillan Depo. at 28:1-5).

Because the individuals who investigated and decided to terminate Ms. Sanichara had no knowledge of her need for FMLA leave, Ms. Sanichara's FMLA request could not have impacted their decision. See Krutzig, 602 F.3d at 1236 (granting summary judgment on an FMLA interference claim where there was "unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate Krutzig, of her request to commence FMLA leave"). No reasonable jury could

find that Ms. Sanichara would not have been terminated but for her FMLA request. Summary judgment is granted on this claim.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant GEICO General Insurance Co.'s Motion for Summary Judgment (Doc. # 43) is **GRANTED.**

(2) The Clerk is directed to enter judgment in favor of Defendant GEICO General Insurance Co. and against Plaintiff Marguerita Sanichara on all counts of the complaint.

(3) Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 15th day of January, 2026.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE